Case number 17-5813, USA v. Robert Doggart. Oral argument not to exceed 15 minutes per side. Ms. Coffin, you may proceed for the appellant. Good morning. I'm Jennifer Coffin here on behalf of Robert Doggart. I'd like to reserve three minutes for rebuttal. Thank you. Sounds good. So I've read the number of issues in my briefs, but today I'd like to focus on three in particular, if I may. Those are the violation of Mr. Doggart's right to due process by applying for WeBe retroactively in his case, the invalidity of the terrorism adjustment insofar as it applies to solicitation offenses, and the failure of count one, the civil rights count, to charge a federal crime. First, due process. Mr. Doggart engaged in a conduct underlying his convictions in early 2015. At the time, binding circuit precedent in this and every circuit that had addressed the question was that reckless offenses did not... Ms. Hamps, would you mind muting it on your end so I don't have to do it? I don't want to make it to where you cannot speak at all. It's just you and I right now. Due process, notice, retroactivity point. Isn't it the case that the defendants involved in WeBe faced the exact same problem, that there was no precedent for using recklessness, and yet, of course, in both cases applied those interpretations to those defendants? Why should Doggart be treated differently? Well, in Voisin, actually, the Supreme Court affirmed the First Circuit's rule that reckless offenses qualified for purposes of misdemeanor crime and domestic violence, which is a different statute, obviously, with different text, so that in that case, the application of the First Circuit rule would not have been a surprise to the defendants in that case. I thought Voisin was an innovation. Voisin was not an innovation. It may have been an innovation at the lower court, but so be it. It's an innovation in terms of recklessness. The question about whether there's been a due process violation is asked from the perspective of the people to whom that new law is applied, and in that case, those particular defendants would have expected it to apply because that was the law in the First Circuit. When they committed their offenses, the law in the First Circuit was that it applied. Oh, you mean did the First Circuit make an innovation? Is that what you're suggesting? Yes. No, the First Circuit applied circuit precedent when it held the reckless offense in that case qualified. Now, Verweeby is a little bit different. I'm not sure that the defendant in that case argued that it would be improper to retroactively apply this court's decision should it hold that reckless offenses apply to him, and the reason it would be different in this case is because Mr. Dart is making that argument, and it is a due process violation to apply it to him, and the error is plain. Even in the advisory guideline system, when there's a miscalculation of the guideline range, the courts find that plain error as a matter of course, even though the conviction remains and the person on remand could get the same sentence, but that's always plain error, and I would say that in this case, because the error is that he was convicted, and it was in violation of the Constitution, and his sentence was increased effectively by 15 years as a result of that error, that it seriously affected his substantial rights and the fairness of these proceedings. So the situation is different here because he's raising it. Okay. This is Jeff Sutton again. I don't know that this was one of the three arguments you wanted to raise, but if you don't mind, it's a question I had. You know, one of the tricky things about this case is exactly what type of plea agreement was entered, and I think if I'm getting this correctly, the key difference is whether it was an 11C1A agreement or an 11C1B agreement, and if it's A, then the district court had authority to reject, but if it's B, that would not be true. Am I right about that? Is that premise correct? Well, this is our position, is that in theory, first of all, our position is that the plea agreement actually was a hybrid agreement. It was partly a charge bargain under C1A. It was partly… Ms. Hance, I've had to mute you on my end. If you need to speak, press star six, please. You're saying if it covers all of them, but why wouldn't the…I agree with Judge Sutton. Why wouldn't the…if it is in any part of 11C1A, why doesn't it give the district court the discretion to reject it? Tony, Mr. Doggart's position is…first of all, before I answer that question directly, I'd like to say that Mr. Doggart does not appeal the rejection of the plea agreement unless this court does not vacate both his convictions, but his argument is that when you all remanded the case, knowing that he could… Can I ask you…I know what you're going to…Ms. Coffin, hold on. Let me stop you. I'm sorry to interrupt you, but I want to ask…ignore our opinion for a second. If it is of a type of 11C1A, you concede. Just take it out of this case. You concede the district court specifically has the discretion to reject it, right? Yes. And you concede that this plea agreement, before you get to that argument you want to make, which I know because of your brief, is of a type specified in 11C1A because it includes a recommendation that they will not bring and dismiss other charges. It is in part a charge bargain, yes, under C1A. Yes. Right. And the rule says of the type, which indicates to me it can be more than one, as you just pointed out. But if it is of the type of A or C, then the district court has discretion, usually. I know in this case you're going to make… Yes. Okay. Go ahead. I'm sorry. Yes, but I… Counsel, this is Judge Sutton. I have to say I'm not sure I understand why it was an A agreement from looking at the agreement itself. I mean, I'm just not sure I understand that. It has this point about if someone violates the terms, what can happen. Like, where's the language which just says straight up, if the court accepts this, no charges? I'm looking at paragraph 11, and, you know, I can imagine the implication that that's what's going on, but I must say it's not clear to me, and it doesn't help me to say it's a hot grid. That's really useless to me in kind of lawyer talk, spelling out what's going on. Well, from Mr. Doggart's perspective, I can say that it was understood by the parties that it was a charge bargain in the sense that had he pled guilty pursuant to the plea agreement, the government was not going to be bringing other charges. I understand what the court is saying, but his position is if he was going to plead guilty to it, it was going to be because the government could not bring other charges. His position in the district court below was that it did include a charge bargain in part. It was of the type that had a charge bargain in it, so he's not going to take the position. Is that in paragraph 11? Is that in paragraph 11? I just want to know where you think that's from. Or is it outside the written document? No, it would be something that we pointed to in the pleadings below. Hold on. Yeah, I'm sorry. This is McKee. Isn't it in the latter part of 11 where it talks about, in addition, the United States may? Isn't that what you're inferring means? It's a charge bargain? I think that is it. I'm sorry. I haven't been focusing on this because it is a conditional appeal, and Mr. Doggart's position is that he first and foremost would like this court to consider his arguments about the invalidity of the convictions so that it's not something that I was completely prepared to get into the weeds on about this particular thing, but there is language in the plea agreement that we did point to in the court below that we said supported the argument that it is in part a charge bargain. And I do think that that is exactly right. Paragraph 11. I'm looking at it right now. Ms. Cousin, this is McKee again. Can we go back to the question that Judge Tappara was asking? If it's a hybrid, as you say it is, what is the import of that? If it's got some elements of an A agreement in it, are you suggesting that he could reject some parts but not other parts? And if so, how would that even work? Well, in the district court below, the argument that Mr. Doggart made was that he could reject some parts but that Mr. Doggart could conceivably still plea guilty to the plea agreement insofar as it's a B agreement. But the district court rejected that completely and said that if he pled, it would be outside the plea agreement. That was sort of an unequivocal statement and that it couldn't predict what would happen and that he would remain convicted of the two convictions that he was convicted of, and it put him in a position that he felt that he could not knowingly and intelligently make a decision about whether to plead under those circumstances, and that is why he returned to this court to continue with his appeal in the challenges of the convictions first. I hope that answered the question. On the arson, it's not that there's no connection to interstate commerce. I mean, in the abstract, one summer camp, when there's a dormant commerce clause case about a summer camp, that suggests the commerce clause applies to camps, even non-profit camps, and bookstores are generally, one would say, an interstate commerce. Is the point here that both were so de minimis or so in such a de minimis way that it connects to the mosque? Yes. The point is this, is that when you examine the evidence, even in the light most favorable to the government, it establishes really at best that there was a formation of an LLT, and there was purchase of ink and supplies during the relevant time period, which was February to April 10, 2015, and that's all that the evidence actually establishes that was going on during that period. Wait, I thought two witnesses testified about the camp. The camp, that's the only additional fact, and I'm glad you brought that up, because the camp is incidental to the mosque. The camp didn't take place in the mosque. The campers didn't sleep in the mosque. But they testified, right? Hold on. I'm sorry to interrupt. But they testified that some of the educational sessions, et cetera, took place in the mosque, and the camp's newfound decision that Judge Sutton references talks about summer camps being enough. And it's got to be right that they—I thought they testified that the educational component was an integral part of the camp. They testified that the— Am I wrong? No, you're not wrong about that. But the testimony was that—I think the word is some—that there were some activities related to that took place in the mosque, but it was very vague, and it sounded as though the large majority of the camp activities and anything to do with the camp is really more about the community as a whole, and that the mosque—the part that the mosque played in the camp was incidental to the camp. But had the camp been—had this been a church at which a summer camp took place every year, and that's where the camp took place, it might be different. But that's not what the evidence established. The camp, from the evidence, took place on the property and mostly in other buildings, and on occasion it sounded like sometimes there was some educational component that took place in the mosque. So, yes, you're right. I'm sorry to interrupt you again. Didn't they clearly think it was important—the mosque was an important attribute to the camp because they canceled it the year that Doggart's threats became known to them? They canceled the camp that year.  He actually threatened to harm the building that—the other two other buildings, one of which was the building that the camp took place in. I'm sorry I'm not remembering exactly what they called the building. I believe it was a community center, and there was also a kitchen, an outdoor kitchen, I think. But the camp itself took place mostly in the rest of the property, and that was included in the threats, the language that was being used by Mr. Doggart. He was talking about all of it. I can't—I don't know that it can be fairly said that the camp was canceled solely because— I mean, if he had—it was because children were coming to the property where all of the buildings were that he was talking about destroying. So, but— You've gone over the initial 12 minutes. Oh, I'm sorry. No, no, it's not your—no. How would you know? But—and let me just make sure my colleagues don't have another question for you now. You'll get your full rebuttal. Judge McKee, do you have any other questions? No, thank you. Judge Sipar, do you have any other questions? No, thank you. Okay. You'll get your full rebuttal. Why don't we hear from Ms. Baldwin for the government? Thank you, Your Honor. Anna Baldwin for the United States. And I'd like to address three issues and any other questions the court has. I plan to address the plea agreement, the force element on count one and the application of the terrorism enhancement. Mr. Daugherty's case is again before this court because of the seriousness of Mr. Daugherty's conduct in planning a violent attack to destroy the Islenberg community's cause, to murder members of its community, and in doing so to spark a civil insurrection. Your Honor, the district court did not abuse the broad discretion that Rule 11C3A places on the district court as to whether or not to accept or reject a Rule 11C1A plea agreement. Can I ask a question about counsel? Counsel, this is Judge Sutton. You know, help me out with these plea agreements. I've got the written agreement in front of me, and what's just very strange about this insistence that it's an A agreement is that it's all by implication. In paragraph 11, it's all about when it becomes effective, what happens if people violate it. It doesn't—you would have thought in the earlier agreement there would be something that says, here's the deal. The deal is you plead guilty to X and we won't charge Y and Z. And everything here is by implication. In fact, even the in addition sentence is followed by a waving statute of limitations. So it's just—I find it very strange. Is this how they're normally done? Is this an unusual one? What am I missing? Your Honor, as far as I'm aware, this isn't an unusual agreement, but I think the language that Judge McKeague earlier pointed out in paragraph 11, that the in addition sentence that the United States could pursue any charges that the United States dismissed or any other charges that the United States agreed not to pursue, that's the 11C1A language. Well, not that I'm familiar with. And I wrote a lot of these plea agreements and accepted a lot of them. And usually there's a separate section talking about the United States agreement not to bring or to dismiss other charges. What Judge Sutton's referencing is there's an affirmative. And a lot of plea agreements I'm familiar with would start with pursuant to 11C1C or 11C1A and B so that it was crystal clear what type of plea agreement it was to the court so the court understood what provisions it was operating under. So I'm a little unclear. I don't think this is it. Maybe it's standard for Chattanooga, but I'm not. I bet I could find quickly 100 plea agreements that include the language I just described at the beginning or a separate section with a promise not to bring additional charges, which I don't see in here. We have to do it by implication. And the language you point to is boilerplate language that's often included. So then every plea agreement will be transformed into an 11C1A. In this case, Your Honor, both parties and the district court all understood that this was a charge-bargain agreement, that by pursuing only this 875C count, that the government wouldn't be pursuing any other counts. And so that, you know, is why— Counselor, this is Judge Sutton. I thought Judge Collier—I thought this whole thing was so strange. It seemed like Judge Collier was construing our opinion as to whether we thought it was an A, B, or C agreement. I mean, this whole idea that everybody understood something seems almost delusional. I mean, and I'm frankly blown away by why the agreement itself would not reference a subsection of Rule 11. That couldn't be more simple or more clear about what the consequences are if you sign this, given what a big difference there is between an A and a B. I don't get it. Judge Sutton, you're certainly correct that the district court did rely in part on this court's opinion as for an understanding of why Mr. Doggart would have been prejudiced by the rejection of the plea agreement and understanding the purpose of the limited remand. But the parties did understand— Can I stop you right there? Sure. I can tell you for a fact we did not know what we were doing on this point. But if one were to draw inferences from what we did, you would have drawn exactly the opposite inference, which is that it was a B and the district court had no authority. So I'm baffled at every front by what you were doing, by what Ms. Coffman was doing, and by what the judge was doing. And to add to Judge Sutton, nor can a court transform one type of plea agreement into another, especially a court of appeals. It's an agreement between the parties. Exactly. You're barking up the wrong tree. Certainly, Your Honor. What we understand the district court to have correctly done here is that the court on the limited remand understood that this court's prior opinion had corrected the legal error in terms of what are the elements that are necessary to sustain an 875C count. That the court's opinion really looked to what are the requirements to plead guilty, but this court's opinion didn't address the sufficiency of the plea agreement in general in the normal framework. How are you helping us by what you're saying? You're just describing the easy parts of the opinion. Help us with what to do about what this agreement was. This agreement, based on the language that we've cited and based on all the parties' understanding in paragraph 11, was a C1A agreement, and there was nothing in this court's prior opinion that would have upended the discretion that the district court has in that context to decide whether, under the... Counsel, I agree with the latter statement. Can I just ask an understanding of the Eastern District of Tennessee's practice? Do you not, when you promise not to bring other charges, include a specific paragraph about that? Isn't that standard practice? I mean, if I go back and look at Eastern District of Tennessee plea agreements, am I not going to find that in a usual 11C1A? Your Honor, I can't speak to what the usual practice in the Eastern District of Tennessee is, but again, the parties all understood and the district court understood that whatever against that usual practice, that this agreement was nonetheless a C1A agreement, and the rule doesn't require that there be a certain way that it is or isn't set out. And given that, that was, you know, the agreement and the charge bargain that all parties understood that they were making. And here, the district court said that under the discretion that it has in its rule that it has to under the... Okay, we got the point of what happens if it's an A. But how about ask...this is a slightly different way of asking Judge DePauw's question. In B agreements, okay, so agreements that are B, isn't it not the case that they often have a paragraph like paragraph 11? In other words, when you have B agreements, don't they say things like, when it's effective, and by the way, if you violate its terms, all bets are off? Isn't that boilerplate language for B and A agreements? And I assume for C agreements, too? You know, this paragraph and everything. Some of that language certainly could be, but again, here, the parties understood this to be, based on that language here, that it was a charge bargain C1A agreement. If the court doesn't have any further questions on the C agreement, I'll turn to the application of the force issue on count one. And in this case, there were two bases that... for the district court to find that count one involved the use of force. There's both the use of force element in 247A and the use of force element in 247D3, and both of those clauses involve sufficient force to qualify as a use of force here. The notion that D3, that, you know, the use of fire, a dangerous weapon, doesn't inherently involve the use of force simply isn't correct. There are no questions on that. Turning just to answer some of the court's questions that you had earlier raised about the interstate commerce, it's clear that DeMosque had a connection to interstate commerce, and again, the standard of review here is viewing the light most favorable to the prosecution, so there's no question that a rational trier of fact could have, on the basis of a summer camp... But doesn't, under the language of the statute, DeMosque have to be used in interstate commerce or in any activity affecting interstate commerce? Certainly, and DeMosque is used in activity affecting interstate commerce in the use of the summer camp that, as the court pointed out, there is testimony that it was used in the religious education camp, religious education classes. So that was one use. And then the other use was in the operation of a business on the second floor. And so you have... Counsel, the business wasn't operating in interstate commerce at the time of the threat, right? It was preparing. It was affecting interstate commerce in that it had incorporated. It had begun purchasing supplies. How does incorporating, you mean as an LLC, how does incorporating affect interstate commerce? That's a totally intrastate activity. Sure, just in terms of becoming a business to begin preparing. So that singular fact would be enough, Your Honor. But begin preparing, it says used in interstate commerce or in activity, and I agree, maybe the summer camp handled this, but I'm skeptical of the bookstore, and is simply an employee going to Staples to buy ink and printers and other things enough for a business to be used in interstate commerce? You have those purchases. Then you have the shipping of the books across state lines. Wait, but the shipping of the books, there was no evidence that occurred at the time of this threat or any time before it, right? That's correct, Your Honor. And so we've cited in our brief some cases that say that, you know, the diner that had an arson prior to its opening, the building that was vacant, as long as there are activities that are, you know, in the process of ---- But those had both interstate commerce activities. You're talking about the First Circuit and the other circuits, but those had activities both before and after the threat that were clearly used in interstate commerce, whereas here you're pointing to the LLC and going to Staples, basically. The diner was ---- I don't think that that had other activities other than the commercial activities to prepare for, Your Honor. So I think that this case is ---- No, my ---- last question, I promise, on this. My point is, is in the diner's case, they were clearly getting stuff from out of state to prepare the operation. And what I don't understand is under your scenario, then even Jones is wrong because if someone going to the store to Staples to buy stuff for the house, if you're setting up an eBay store at your house, would ultimately be used in interstate commerce. And if the statute said will be used, I think I'd agree, but I'm skeptical otherwise. Your Honor, I don't think the distinction can turn onto whether one goes to Staples or buys products. I mean, you could certainly show that the products at Staples had come from across interstate commerce. And again, this is preparing a business to use substantial interstate sales. And I don't think it magically transforms into substantially affecting interstate commerce simply on the day that you switch on the open for business sign. But in any event, if the court has a question about that ---- Jones is trying to clarify that de minimis uses are not going to transform every arson into a federal crime. Why isn't that the way to think about it? Absolutely. And operating the mosque as a bookstore, with a bookstore on the second floor, isn't a de minimis use. The nonprofit summer camp that's bringing campers across state lines isn't a de minimis use. And just comparing this case to Rayburn from the circuit, where you had a church that was simply paying other radio stations out of state. It's not even operating its own radio station. It's just sort of engaging in commerce. I think the evidence here is arguably stronger than the evidence in Rayburn, where you have both the longstanding summer camp and the bookstore at the mosque. I mean, shouldn't one focus on the main use? The main use of a mosque is for religious purposes. I mean, under your theory, presumably tithing would count as long as somebody tithes from across the state line. And I would have thought the better way to think about it is, no, it's a mosque. This is for spiritual purposes, not commercial. And all religious institutions are going to have some peripheral incidental, whether it's a camp, a Bible camp, or whatever it might be. And you look at the main, not the incidental, in figuring out how to apply Jones. Your Honor, there are a number of cases that have said that operating a daycare, and again, this isn't a normal kind of just local community daycare. This is a camp where children came from across state lines. And so even if the court is concerned, and I think the operation of a business that actually prints books and sells them, that maintains a mailing list of people out of state, that's not a kind of thing that every church is going to do, and so isn't going to federalize arson of every kind of religious building. The Zavia books' evidence is specific and different, I think, from most houses of worship. But the summer camp that attracts, you know, students from across the country, that certainly is distinct, and that's not something that's just like a local daycare or a local, you know, week-long religious camp in the summer. Your Honor, last on the terrorism enhancement, the district court properly applied the terrorism enhancement in this case. This court's decision in Graham makes clear that the offense can be applied to offenses of conviction that are not themselves listed enumerated federal crimes of terrorism, as in Graham it applied to a conspiracy conviction for conspiracy solicit arson, which is a listed federal crime. And on the factual objection here, the district court made no error, much less clear error, in finding that the defendant's conduct was calculated to influence or affect the conduct of the government through intimidation, coercion, or retaliation against the government. And notably, the defendant isn't challenging the actual factual finding related to the terrorism enhancement, but just arguing that it's inconsistent with the district court's other findings. Thank you, Ms. Baldwin. You've gone over a minute or two, and thank you for responding to our questions. And, Ms. Coffin, I think you've got some rebuttal. Yes. I would actually, after I said all that, return to the plea agreement. And it's because of some of the things that the court said during the most recent conversation. And I'm sorry I don't know which of you said it, but one of the judges said we did not know what we were doing, frankly, when it made the statements that it did in the opinion. And I'd like to say that it sounded to me that the court was of the view that if it were a C-1B agreement, that the court was saying that the district court must accept that agreement, and in that event, the plea under the agreement, and then it would vacate the convictions, which was something that the district court called into question. So if that is true, if the court was actually saying that the district court... Counsel, this is Judge Sutton. I have just a factual or experience question. Is this paragraph 11 a paragraph that would show up in B agreements? I do think it is the kind of language that shows up in B agreements, yes. In fact, at first, the government said the court could not reject the agreement, and in the beginning, there was some... And that, of course, is premised on the assumption it was a B agreement. I would think... It was a surprise. The whole moment that occurred when the judge suggested he could reject the plea agreement, I think it did catch everybody by surprise, and there was some initial statements were made, and then there was some regrouping, and from Mr. Doggart's perspective, for it to be a B agreement means that the court could not reject it, and that would have been something that would have been his position. I thought you said in the initial colloquy with us that you thought it was in part in A agreement and everyone was operating under that assumption below. That is... It is that. His position was it was both. It was something that the district court could not reject because it was a B agreement. That part of it was a B agreement, but that it could conceivably in theory reject the C agreement. That was his position, and that occurred, of course. I mean, plea agreements all the time can be of the type that are A and B. That happens every day in America, and if that is the case, then why isn't it that the language of the rule says that you can reject it? Because it says if it's in A, the court may accept the agreement, reject it, or defer, and that says B agreement. So if it's of the type that is in A, the district court always has the discretion to reject it. Why isn't that the case? It is the case, except for the part that it's a B agreement. I believe we cited a case in our pleadings below in which the Court of Appeals there, and I'm sorry, I can't remember the name of it, but the Court of Appeals there said you could reject the A, the charge bargain aspect of it, but you couldn't reject the plea agreement as a whole insofar as it's a B agreement. But what I'd like to say now is that if this court was saying back when it issued its initial opinion that it was a B agreement and that the court must accept it if it accepted that the factual basis was sufficient for the plea and that at that point you would vacate the convictions, then Mr. Daugherty would ask for the court to make that clear, to say that. Because what happened was when the district court said that I'm rejecting this plea agreement in whole and so therefore anything you do is going to be outside the agreement and that means these convictions will not be vacated, that put him in a position where he could not knowingly and intelligently move forward. So if the court meant that if it's a B agreement it should be rejected, if it is a B agreement and that means the court cannot reject it, then Mr. Daugherty would want the court to make that clear. I feel like I'm probably getting close to it. Yeah, you've gone all over it. I just want to ask one other factual question. I mean, is there anything else that would help us understand whether it was B or A? And, you know, the hybrid thing doesn't really answer it because it could be B in a respect which is not rejectable, right? So it's not very helpful to us to use that. So it's really if it's a B agreement that it would matter in this sense. And I'm just asking is there any other evidence that we could consider on that point? I don't know that I have any other evidence that I could offer at this point except to say that it was not clear that if it was a B agreement, even in part, that that would mean that the convictions would be vacated. And Mr. Daugherty would want that to be clear in order to know what he's doing if he's in that position. And that's really the most I can say about that at this point. Okay. All right, well, let me just make sure. Judge McKee, do you have any other questions? No, thank you. Judge DePard, do you have any other questions? No, thank you. All right, well, thanks to both of you. Thank you, Ms. Baldwin. Thank you, Ms. Coffin. We appreciate your answering our questions. We realize phone arguments are not ideal, but it's still helpful to us. And since this is a CEQA, we thought this was the best way to handle it.  Thank you. Thank you. You are now in silent mode. Your Honors. You are now in talk mode. Your Honors, are you still there? Yes. Okay, thank you. Yes. So we're going to ask counsel right now to please disconnect. And Terry, please confirm when the attorneys have both disconnected. They have disconnected at this time. Thank you very much. Your Honors, if you need to contact the operator, in case you cannot hear one of your colleagues, you'll just need to press star zero, and then she can verify for you that everyone's still on the line. And do you require anything? Hey, thanks so much. You're welcome. And happy holidays. Thanks for helping us make this work. Absolutely. Thank you very much. Happy holidays to you as well. Do you guys require anything further at this time? I don't think so. Okay, operator, please assure that the judges, once I hang up, that no one else is on the line. Yes, ma'am. Thank you very much. Have a great day. Thank you.